UNITED STATES DISTRICT NEW YORK
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAURA CUNNINGHAM,<br><br>                              *Plaintiff,*<br><br>      v.<br><br>NEAR FOUNDATION, PEOPLE 2.0<br>NORTH AMERICA LLC, and WORKCO<br>INTERNATIONAL LLC,<br><br>                              *Defendants.* | Case No. 1:26-cv-3378<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Laura Cunningham, by her undersigned attorneys, Lacuna Law PLLC, for her Complaint herein against Defendants NEAR Foundation, People 2.0 North America LLC ("People 2.0"), and WorkCo International LLC ("WorkCo") (collectively, the "Defendants"), alleges as follows:

### NATURE OF THE CASE

1.      Ms. Cunningham began her employment with NEAR US, a wholly owned subsidiary of the Swiss "Stiftung," or not-for-profit, NEAR Foundation (NEAR US and NEAR Foundation are collectively referred to as "NEAR" or the "Foundation") in September 2022. NEAR aims to foster an ecosystem centered on a fully functional, decentralized blockchain platform designed to encourage developers to build and deploy decentralized applications at scale. Beginning in April 2023, NEAR opted to employ its U.S. employees, like Ms. Cunningham, through a series of employers of record, including People 2.0 and WorkCo.

2.      Ms. Cunningham supported NEAR's growth as she led a team to build and bring to market new programs and products in service of significant growth of the NEAR ecosystem. Ms. Cunningham raised significant funds for the NEAR community during her tenure and was relied

upon by the Foundation for her innovative ideas and ability to work across the many different teams within NEAR.

3.    At the end of 2023, NEAR's was in turmoil after its then-CEO, Marieke Flament, was ousted following a months' long campaign against her undertaken by NEAR co-founder Illia Polosukhin and other males within NEAR recruited by Polosukhin.

4.    This campaign was conducted, in part, on NEAR's online community forum where numerous posts were published in which users called Flament a "bitch."

5.    As a result of Ms. Flament's ouster, there was an exodus of female senior leaders at NEAR and across the NEAR network.

6.    Thus, in order to stem the tide of departures of female senior leaders, on September 23, 2023, NEAR offered Ms. Cunningham, among other employees, a retention agreement (the "Retention Agreement")—offering nine months' severance and token vesting should she remain at the organization through January 31, 2024.

7.    Ms. Cunningham was not required to execute the Retention Agreement in order to accept it. She merely needed to remain at the organization through the specified date, which she did.

8.    During the time at which the campaign against Ms. Flament was conducted and subsequent to her ouster, the Foundation became a hostile workplace towards women, who were treated as second class citizens and routinely subjected to mistreatment.

9.    This conduct resulted largely from the toxic masculinity ushered into NEAR and promoted by Polosukhin, who eventually became NEAR's CEO, and his acolytes.

10. Among the various incidents that occurred were male staff openly messaging their support for a known misogynist and accused sex criminal and pornographic images being published in a video on NEAR's Twitter account.

11. At no point did NEAR take any disciplinary action against the perpetrators of such conduct. In fact, they rewarded the individuals who participated in this abhorrent conduct.

12. Beyond this, Ms. Cunningham was regularly demeaned and her contributions and qualifications dismissed by Polosukhin after he became CEO of NEAR.

13. At the end of 2024, this culminated with Ms. Cunningham—at that point the last remaining senior female executive—being pushed out of the Foundation.

14. On October 24, 2024, Ms. Cunningham met with Donovan to share her serious concerns about NEAR's toxic culture for women and her own future there. Ms. Cunningham described Polosukhin's bullying of her and how his behavior had exacerbated Ms. Cunningham's anxiety over the last year.

15. Donovan lacked solutions for her concerns and, when raising the possibility of Ms. Cunningham leaving the Foundation, he unprompted raised the Retention Agreement and confirmed that she would receive the Retention Bonus were she to leave NEAR.

16. Yet, NEAR thereafter reversed course and refused to honor the Retention Agreement upon Ms. Cunningham's separation even though (i) Donovan—the architect of the Retention Agreement—had informed her she was eligible to receive the benefits of that agreement and (ii) multiple other former colleagues of Ms. Cunningham had received the benefits promised to them under the Retention Agreement when their employment with NEAR ended.

17.     Ms. Cunningham was shocked by NEAR's brazen disclaimer of a valid agreement on which she had performed her side of the bargain. Yet, unfortunately she was not surprised by the Foundation's mistreatment of her as its last remaining senior female executive.

18.     When it came time for Ms. Cunningham to depart the Foundation, not only did NEAR refuse to pay the Retention Bonus, it retaliated against her for retaining legal counsel to assert her rights with respect to her earned bonus and the discrimination she faced in the workplace—ending her employment earlier than previously agreed and stripping Ms. Cunningham of the 2024 End of Year bonus payment of $81,000 after having confirmed only a few days earlier that should would receive her 2024 bonus.

19.     In addition to the dire financial repercussions of NEAR's actions, Ms. Cunningham's discriminatory and retaliatory treatment by NEAR has caused extreme emotional distress, causing her to experience debilitating anxiety regarding the fallout with the Company.

20.     As a result of its conduct, NEAR is liable for breach of contract as well as breach of the implied covenant of good faith and fair dealing under New York contract law for failure to uphold its end of the Retention Agreement.

21.     The failure to pay Ms. Cunningham the Retention Bonus and End of Year Bonus also constitute a violation of New York Labor Law ("NYLL") § 193 and the retaliation against her for raising this matter to NEAR constitutes retaliation in violation of NYLL § 215.

22.     Defendants' actions with respect to Ms. Cunningham also constitute a hostile work environment and discrimination based on sex, and related retaliation, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL").

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction over this lawsuit pursuant to pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

24.     This Court has personal jurisdiction over Defendants because Defendants intentionally acted in such a way as to cause injury to Plaintiff in the State of New York.

25.     Venue is proper in this district by virtue of 28 U.S.C. §§ 1391(b) and (c) because this is the judicial district in which Plaintiff performed her work for Defendants and a substantial part of the events or omissions giving rise to the claims occurred.

**PARTIES**

26.     Plaintiff Laura Cunningham, at all relevant times herein, was and is a female resident of Brooklyn, New York.

27.     At all relevant times herein, Plaintiff was a female "employee" entitled to protection by relevant state and city laws referenced herein.

28.     Upon information and belief, Defendant NEAR Foundation is a Swiss "Stiftung" incorporated in Switzerland with its principal place of business is located in Zug, Switzerland.

29.     Upon information and belief, Defendant People 2.0 North America LLC is a limited liability company incorporated in Florida with its principal place of business located in King of Prussia, Pennsylvania.

30.     Upon information and belief, Defendant WorkCo International LLC is a limited liability company incorporated in Delaware with its principal place of business located in Kent, Delaware.

**FACTUAL ALLEGATIONS**

**A.    Ms. Cunningham Worked Tirelessly for NEAR and Excelled Despite a Tumultuous Environment**

31.    On September 6, 2022, Ms. Cunningham began her employment at NEAR as a General Manager. She was excited by the Foundation's mission to develop a self-sustaining, decentralized blockchain platform, and its professed progressive workplace culture.

32.    Throughout her tenure at the Foundation, Ms. Cunningham was an extremely hardworking and dedicated employee. Ms. Cunningham's work ethic supported NEAR's growth as she led a team of product managers, UI/UX designers, data analysts, ecosystem builders, developers, and strategists to build and bring to market new programs and products in service of significant growth of the NEAR Ecosystem.

33.    As a General Manager, Ms. Cunningham was focused on developer education and built an accelerator program called NEAR Horizon. While creating NEAR Horizon, Ms. Cunningham stabilized the Horizon team by cutting unnecessary roles, improving morale and team outcomes, and hiring a high-performing lead to run day-to-day operations of the Horizon accelerator. Within two months, Ms. Cunningham launched the Horizon App "MVP" at ETHDenver—an exceptionally short timeline for such a build—and partnered with six high profile Venture Capital firms for launch.

34.    In or around April 2023, NEAR decided that it no longer wished to be the employer of record for its U.S.-based employees, such that all of NEAR's U.S.-based employees became employees of People 2.0 that were, upon information and belief, then contracted out to NEAR.

35.    However, this change had no functional impact on Ms. Cunningham's work for NEAR or on the nature or structure of the workplace at NEAR. NEAR continued to control Ms.

Cunningham's job duties; she continued to work in the same role with the same responsibilities and reported to the same people as she had prior to People 2.0 becoming her employer of record.

36.    In September 2023, Ms. Cunningham's team launched the first cohort experience for the Horizon Accelerator. The Horizon team built the entire cohort experience, recruitment process, operational management structure and go-to-market strategy. The initial cohort raised an impressive $2.2 million in funding in an extremely challenging market and drew over 1,100 live viewers on its demonstration ("demo") day.

37.    Ms. Cunningham's successful leadership and results for Horizon motivated NEAR to select her to lead the Founder Success Strategic Pillar, which drove an organization-wide vision for founder recruitment and support.

38.    Ms. Cunningham's success at NEAR continued into 2024, when she ran the second Horizon cohort, which would eventually become a critical component for NEAR's AI strategy, raising $3.5 million in external capital and attracting 1,800 viewers for its demo day. In total, the Horizon team raised $19.5 million in external capital for NEAR under Ms. Cunningham's leadership.

39.    After seeing NEAR through an incredibly tumultuous change in leadership at the end of 2023, in April 2024, Ms. Cunningham was promoted to Head of Product for NEAR. As Head of Product, Ms. Cunningham steered the direction of NEAR's AI product while effectively transitioning NEAR Horizon from an acceleration program to an incubation program. Ms. Cunningham and her team unveiled the AI Hub Alpha, which required extensive user and market research to create the Alpha's Hub product itself. Ms. Cunningham's delivery demonstrated her ability to work across teams within NEAR.

40.    Chris Donovan, COO at NEAR and Ms. Cunningham's supervisor, consistently

rated Ms. Cunningham as "exceeds" in both performance and behavior. Reviews of Ms. Cunningham's performance praised her ability to deliver results in a challenging market and ever-changing work environment. Donovan highlighted Ms. Cunningham's ability to motivate her team and bring resilience and versatility within her role. Ms. Cunningham was undeniably an asset to NEAR.

41.    In or around July 2024, Ms. Cunningham's employer of record changed again such that she became employed by WorkCo.

42.    Again, this change had no functional impact on Ms. Cunningham's work for NEAR or on the nature or structure of the workplace at NEAR. NEAR continued to control Ms. Cunningham's job duties; she continued to work in the same role with the same responsibilities and reported to the same people as she had prior to WorkCo becoming her employer of record., as she continued to work in the same role with the same responsibilities and reported to the same people, or on the nature or structure of the workplace at NEAR.

**B.    NEAR's Male-Dominated Culture Pushed Out Senior Female Leadership**

43.    Ms. Cunningham succeeded in her role at NEAR despite extreme turmoil with respect to the Foundation's leadership.

44.    Contrary to the progressive values the Foundation had touted when Ms. Cunningham joined NEAR, the Foundation's leadership was overtaken by a male-dominated "crypto-bro" culture, in which women were not treated as rightful leaders of the Foundation.

45.    Beginning in July 2023, NEAR co-founder Illia Polosukhin ("Polosukhin") targeted and relentlessly attacked Ms. Cunningham's manager and the CEO of NEAR, Marieke Flament ("Flament"), who had long been a bulwark against Polosukhin's toxic leadership style and misogyny expanding throughout NEAR

8

46.    Polosukhin also recruited other males within NEAR to and assist him in undermining and discrediting Ms. Flament, with the goal of eventually forcing her out of the Foundation.

47.    Polosukhin and these other males waged their campaign through multiple avenues, including on Twitter, Discord—on which there was a NEAR protocol moderated by the Foundation—and Telegram—on which there were a number of groups used by employees to communicate with one another, some of which were moderated by the Foundation.

48.    In these channels, Polosukhin and the other males regularly disparaged and harassed Flament, including numerous posts in which Ms. Flament was called a "bitch."

49.    Despite some of these disparaging and harassing comments being made in channels moderated by the Foundation, neither NEAR leadership nor the NEAR Foundation Council ("NFC"), which acts as NEAR's governing body, took action to remove these hateful public comments or otherwise address the actions of those within NEAR targeting Ms. Flament.

50.    The sustained hostile actions of Polosukhin and his cohort eventually resulted in Polosukhin orchestrating a vote by NEAR's board to strip Ms. Flament of her role as CEO in September 2023.

51.    A few weeks later, Ms. Flament and the only other female member of the Foundation's board were ousted from their seats.

52.    In the absence of any strong female leadership that resulted from these actions, Polosukhin and his followers were able to dominate leadership at the Foundation.

53.    In September 2023, NEAR leadership  NFC appointed Donovan as Flament's replacement. (Donovan would soon be replaced by Polosukhin himself). With this, men exclusively held all of the executive leadership roles at NEAR.

54. After this change in leadership in September 2023, and as a result of the treatment of Ms. Flament and the hostile work environment for women across the NEAR network that arose in her absence, multiple senior female leaders at NEAR and other entities within the larger NEAR network (which are largely controlled by the NFC)—such as Pagoda, NEAR One, NEAR Prime, and Aurora—left their roles.

55. At this point, it became clear to Ms. Cunningham that the shift in NEAR's culture and leadership meant she would have an uphill battle to succeed as a female leader at NEAR.

**C. NEAR Offers Ms. Cunningham and Other Members of NEAR Leadership Retention Agreements**

56. Following Ms. Flament's ouster and the resulting departures of other female employees, in order to calm employee anxieties related to the drastic and acrimonious shift in leadership and put a stop to the anticipated employee turnover, NEAR offered key employees— like Ms. Cunningham—an incentive to entice them to remain in their positions.

57. Specifically, on September 28, 2023, Donovan, the newly appointed CEO of NEAR, sent the Retention Agreement to Ms. Cunningham, among others, offering her nine months' salary plus token vesting if she were to stay on as an employee at NEAR through "*at minimum*" January 31, 2024.

58. The Retention Agreement explicitly states that its intention is to "ensure operations are minimally affected"—a typical reason why companies enter into such bargains.

59. To achieve this goal, the Retention Agreement offered Ms. Cunningham :

> [I]f there are any modifications in positions or if any of you decide to transition away from the organization, [w]e have agreed [sic] an approach with the NFC to ensure that those impacted by such decisions are treated with fairness and respect for their significant contributions. This includes package of *9 months* [sic] *salary plus token vesting*, subject to [ ] signing a separation agreement[1] and committing

---

[1] By tying receipt of the Retention Bonus to the signing of a separation agreement, NEAR set itself up to benefit by obtaining a release of claims from employees upon their departure as well.

to a transition period until ***(at a minimum) of 31 January 2024 to ensure operations are minimally affected.***

60.     Notably, the Retention Agreement did not reference any expiration date by which Ms. Cunningham was required to exercise her right to receive the package of 9 months' salary plus token vesting Retention Bonus. Upon information and belief, the Retention Agreement intentionally drafted to be open ended so as to encourage employees to remain with NEAR.

61.     The only exception included in the agreement (as would be typical in such retention agreements) was that an employee whose termination was precipitated by gross negligence or misconduct would lose the right to the package.

62.     The Retention Agreement also explicitly states that NEAR was offering Ms. Cunningham this bonus in recognition of her ***past*** contributions to the Foundation:

> I wanted to take a moment to extend my gratitude for the dedication and professionalism you have demonstrated during this time of change in our organization's management. Your commitment to the NEAR Foundation has been instrumental to ensure continuity and support our shared vision.

63.     By the Retention Agreement's own words, there can be no doubt that it was offered to entice key employees like Ms. Cunningham to remain at the Foundation, and in recognition of their past contributions to the organization.

64.     It was not necessary for Ms. Cunningham to execute the Retention Agreement in order to accept it; she only needed to continue working at NEAR through at least January 31, 2024.

65.     Like other women, Ms. Cunningham's experience at NEAR following Ms. Flament's ouster was very unpleasant to the point that Ms. Cunningham was considering leaving NEAR prior to the point at which she would have earned the Retention Bonus.

66.     Aware that Ms. Cunningham was a valuable employee and wanting to ensure that she remained with the company, Donovan regularly and repeatedly called Ms. Cunningham to ask

her to not leave NEAR.Ms. Cunningham ultimately opted to remain with NEAR and a significant reason why she did so was the prospect of earning the Retention Bonus.

67.    Ms. Cunningham worked for NEAR well beyond this date and having done so was owed the Retention Bonus upon her departure from NEAR, without discretion.

**D.    NEAR Fostered a Hostile Work Environment for Women**

68.    Despite Ms. Cunningham's dedication to and achievement for NEAR, she was never met with the respect her work warranted once Polosukhin and his supporters took control of the Foundation.

69.    Over the last year and a half of her employment, the mistreatment of Ms. Cunningham and the hostile environment that women faced at NEAR intensified. Polosukhin's leadership forced highly qualified senior women, including Ms. Cunningham, out of roles for which they were eminently qualified for through isolation, harassment, and intimidation.

70.    From the start of Polosukhin's tenure as CEO in 2024, his leadership embodied toxic masculinity, and NEAR's transformed all-male executive team emboldened male employees to engage in a "boys' club" in the workplace.

71.    For example, shortly after he took over at NEAR, in February 2024, Polosukhin engaged in a knife fight while at a conference representing the Foundation. Polosukhin posted a photo of the exchange on social media with the caption: "*you may not like it but this is what peak male performance looks like*." The post promoted male aggression and dominance and reaffirmed traditional male gender roles at NEAR.

72.    Male employees even called each other "sir" (with no such way to address female employees) and sent around memes starting with the phrase, "me when my girlfriend says …" followed by a sexist joke.

73.     On September 5, 2024, a tweet was posted on NEAR's official X account making fun of men with low testosterone: "if you are infected by the crypto mind virus, use this to stop being a low T manlet." The post was insensitive and suggested women were not part of NEAR's user base or participants in the NEAR Ecosystem.

74.     Ms. Cunningham sent the tweet to Donovan with her concerns about the sexist message it sent about NEAR and its products. NEAR did not address the offensive post. It became clear to Ms. Cunningham that Polosukhin's leadership encouraged toxic masculinity to run unchecked throughout the Foundation.

### E.     Ms. Cunningham is Undermined and Excluded by the Male Members of her Team

75.     Ms. Cunningham bore the brunt of this sexist behavior when her male colleagues began to exclude her from key decision-making conversations regarding NEAR AI product strategy in the fall of 2024. Ms. Cunningham's primary responsibility was to manage NEAR AI product strategy, and Polosukhin in particular isolated Ms. Cunningham from her own project.

76.     For example, on September 26, 2024, Ms. Cunningham met with Polosukhin and several others to determine whether to move forward with building the "AITP" (AI Transfer Protocol). At this meeting, Ms. Cunningham and her direct report made a presentation on product strategy for AITP. Following the presentation, Polosukhin complimented the presentation, saying it was "great," and stated that the strategy made sense and that Ms. Cunningham and her team should proceed with the strategy.

77.     The following week, in a meeting for NEAR AI, Polosukhin rudely asked Ms. Cunningham, "Is this a meeting about another meeting or will we actually do work?" Polosukhin then proceeded to challenge the very strategy that he had agreed to the week prior as if that meeting had never occurred.

78. This was part of a pattern where Polosukhin challenged Ms. Cunningham regarding the direction of NEAR AI and rebuffed all of her proposals for NEAR AI's strategy. It became evident to Ms. Cunningham that Polosukhin did not respect her or her contributions to the team.

79. This sentiment was further solidified when Polosukhin hired his friend Jay Zalowitz for the NEAR AI team without consulting Ms. Cunningham, despite it being Ms. Cunningham's primary responsibility to manage NEAR AI.

80. Subsequent to the hiring of Zalowitz, Ms. Cunningham determined that Polosukhin and Zalowitz were excluding Ms. Cunningham from conversations about product strategy for NEAR AI and ultimately making decisions for the direction of NEAR AI without including Ms. Cunningham.

81. This conduct undermined Ms. Cunningham's management of NEAR AI and left her unable to do her job or lead her team given that she was being kept in the dark by Polosukhin and Zalowitz about developments at NEAR AI. This severely upset Ms. Cunningham both since she was being excluded because she was not a member of Polosukhin's boys' club and she functionally had been stripped of her job responsibilities without any basis.

82. Owing to this, on October 24, 2024, Ms. Cunningham met with Donovan to share her serious concerns about NEAR's toxic culture for women and her own future there. At this meeting, Ms. Cunningham described Polosukhin's bullying of her and how his behavior had exacerbated Ms. Cunningham's anxiety over the last year.

83. For months prior to this, Donovan checked in weekly with Ms. Cunningham to see how she was doing and address the manner in which Polosukhin had mistreated her during the prior week.

84.    During these calls, Ms. Cunningham told Donovan of the severe mental strain that working at NEAR under Polosukhin was placing on her, including telling Donovan that she was depressed and that it was incredibly difficult for her to come to work given Polosukhin's behavior.

85.    Unfortunately, Donovan lacked any solutions for her concerns outside of her of leaving NEAR.

86.    Yet, without Ms. Cunningham first raising the issue of the Retention Bonus, Donovan said that if she felt she had no choice but to leave the Foundation, she still was entitled to receive the nine months' salary and token vesting as set forth in the Retention Agreement. Donovan also stated that, despite Ms. Cunningham being entitled to the Retention Bonus, he expected Polosukhin and others at NEAR would resist providing her with the Retention Bonus, and suggested she hire counsel in order to fight for the Retention Bonus, even going as far as saying he could recommend some attorneys who might represent her.

87.    On October 31, 2024, Ms. Cunningham went to NFC member Diogo Monica ("Monica") to again raise the bullying behavior directed at women by Polosukhin. In particular, Ms. Cunningham expressed that her role had been increasingly challenging under Polosukhin's leadership. She told Monica she feared Polosukhin lacked the ability to responsibly manage the NEAR community funds, given his multiple lapses in judgement as the CEO.

88.    Ms. Cunningham also noted the impact of Polosukhin's leadership on the Foundation's culture. NEAR employees provided dismal culture scores on the recent employee engagement survey, which had demonstrated Polosukhin's poor performance.

89.    Ms. Cunningham told Monica of the psychological impact that the toxic and hostile work environment perpetrated by Polosukhin, specifically that it was making her anxious and depressed, with the situation affecting her sleep and her motivation to come to work each day.

90.     Monica responded by say that no one should have to feel the way that Ms. Cunningham was feeling and that, is he wanted to find another job, he would help her do so.

91.     On December 10, 2024, Ms. Cunningham, as the only remaining female executive, met with Polosukhin to discuss what her role would be at NEAR AI.

92.     Prior to this meeting, Ms. Cunningham had spoken with Donovan on a few occasions regarding her potentially working for NEAR AI. A few days earlier, Donovan informed Ms. Cunningham that Polosukhin was going to offer her a role at NEAR AI at this meeting (to her recollection, the title for the meeting suggested this as well).

93.     The discussion with Donovan came after several other discussions between he and Ms. Cunningham regarding NEAR AI. In those conversations, Donovan had asked Ms. Cunningham what role she would want at NEAR AI, and she had stated COO/Head of Product. Based on her experience and performance, Ms. Cunningham expected to be in an executive role at NEAR AI.

94.     Indeed, she consistently had been asking to be promoted to Chief Product Officer from early 2024. She had been doing the work of the CPO and there was no more senior person on the team, so she felt she should have the title since she was functionally acting as the CPO.

95.     However, while men were repeatedly promoted to "chief" roles within NEAR, Donovan told Ms. Cunningham that Polosukhin had said he would never give this role to Ms. Cunningham.

96.     When the December 10 meeting began, it quickly became clear that Polosukhin had not gotten the memo that he was supposed to offer her a position with NEAR AI or he still refused to elevate her, because she was a woman, to an executive position.

97.    Polosukhin clearly had failed to prepare for the meeting, as he came with no information about what Ms. Cunningham's potential title job or responsibilities would be at NEAR AI or what her role would be concerning NEAR AI's product.

98.    Instead, Mr. Polosukhin stated that NEAR AI had a lot of work to do and patronized her by asking, rhetorically, "Do you think you can do it?" The question served no purpose other than to demean Ms. Cunningham.

99.    Polosukhin proceeded to lecture Ms. Cunningham that "not delivering" was common in crypto, implying Ms. Cunningham's work was not to be taken seriously.

100.    While Ms. Cunningham saw the success of this meeting as crucial to the question of whether she would be able to remain at NEAR, Polosukhin demonstrated that Ms. Cunningham's role at the Foundation was nothing but an afterthought and that he, and NEAR, did not believe that Ms. Cunningham, despite her track record of success, was capable of performing any role at NEAR AI.

101.    The entire experience was deeply humiliating for Ms. Cunningham.

102.    Following the meeting, Ms. Cunningham was at a loss for what had just occurred given that she had expected to be offered a role with NEAR AI and now it appeared that Polosukhin and NEAR did not see her in their future plans.

103.    Ms. Cunningham messaged Donovan informing him the meeting with Polosukhin did not go well. Donovan called Ms. Cunningham, and after she relayed the details of what had occurred, he stated, "I can't continue to ask you to stay after that conversation."

104.    Over the following months, Ms. Cunningham was further sidelined and witnessed the continued deterioration of the work environment for female employees at NEAR.

105. On January 27, 2025, Ms. Cunningham attended the 2024 End of Year performance review calibration meeting. During the meeting, NEAR rewarded male employees who had made NEAR a hostile work environment for Ms. Cunningham and other women.

106. Harshit Tiwari, one of the employees who received accolades, a promotion, and a full bonus, had recently posted on X: "I've heard that building on NEAR increases your sex appeal, is this true?" NEAR, however, still found it appropriate to elevate the status of Tiwari.

107. After Ms. Cunningham's pleas to the NFC at the end of 2024 to clean up the Foundation's culture toward women went unanswered, she was too intimidated to speak up against Tiwari's elevation for fear of retribution in her own performance review. The male executives of the Foundation had repeatedly demonstrated that they did not value Ms. Cunningham's input on workplace culture throughout the last year.

108. Tiwari's post on X was not an isolated incident, as several of NEAR's male executives and employees had posted social media statements sharing offensive viewpoints on workplace culture and diversity, or offensive sexual pictures and comments.

109. The most egregious example of this occurred on February 13, 2025, when a senior product manager named Andrew, from Aurora—a NEAR-funded entity—hosted a livestream demonstration on behalf of NEAR with Cameron Dennis, a contractor paid by NEAR and staffed on NEAR AI under Ms. Cunningham.

110. During the livestream, Andrew minimized the demonstration window and exposed pornographic photos of a topless woman in the background. NEAR was aware of the incident, and rather than take appropriate action, decided to repost the livestream on X.

111. NEAR's leadership worked with no urgency to remove the offensive content. Dennis responded to posts about the incident with jokes regarding his reaction.

112.    The incident gained traction with the media, and rather than shut it down, male executives and employees at NEAR went to X to join in on the fun at women's expense.

113.    David Morrison, head of creative campaigns and social media at NEAR, posted a mocking response to the incident in which he "addressed" the pornographic photos of a topless woman without wearing a shirt himself.

114.    The co-founder of NEAR Prime (and one of Polosukhin's close friends), reposted Morrison's video and made fun of the public exposure of female breasts.

115.    Andrew posted a facetious statement "ONLY" apologizing to his girlfriend—the individual purportedly in the topless photos.

116.    Jarrod Barnes and David Sha, two of the only responsible male senior leaders at the Foundation, pressed NEAR leadership to remove the video. Tiwari and Morrison actively fought *against* removing the video. Tiwari went so far as to say, "After all isn't attention all we need?" and "I understand we have to say we are sorry but wondering whether this hinders the buzz we were getting."

117.    To acknowledge the Foundation's mishandling of the incident, Barnes, on his own behalf, sent an apology to the women remaining at NEAR referencing the incident. Barnes was the only senior male at NEAR to reach out to his female colleagues about the incident, and he quit NEAR shortly after this because of NEAR's mishandling of the situation.

118.    Crucially, NEAR never disciplined any of the male employees or executives that joked about the incident or otherwise condemned their conduct.

119.    In the wake of the pornographic photo incident, Ms. Cunningham felt further disrespected, isolated and harassed as a woman working at NEAR. The incident also united NEAR's female employees to come together over Slack (the Foundation's internal messaging

system) and emphasize that the incident was part of a much bigger problem: women were treated as "less than" at NEAR.

120.    As with Ms. Cunningham being denied the title of CPO though she was qualified for that role and functionally acting as NEAR's CPO, other women were repeatedly passed over for promotions, only to see men—who were often less qualified—promoted or hired over them.

121.    For example, like Ms. Cunningham, Yadira Blocker functionally acted as NEAR's Chief Marketing Officer / Head of Marketing for almost two years without being formally elevated to the role.

122.    Instead, Polosukhin brought in consultants to manage over her and then hired a man as "Chief Growth Officer" to manage Ms. Blocker.

123.    Consistent with this, when on February 14, 2025, Ms. Cunningham met with Ms. Blocker to say goodbye, Ms. Blocker broke down in tears and stated she felt bullied by NEAR's leadership. Ms. Blocker also shared with Ms. Cunningham that she did not have any real power in her position and was shut down if she ever challenged the male executives' decisions and behavior. Ms. Blocker's experience resonated strongly with Ms. Cunningham's own.

124.    Similarly, Franka Bestmann functionally stepped into the role of Head of People / Chief People Officer but was never given that title. Further, Polosukhin sidelined her from strategic conversations related to her role, ignored her recommendations and refused to give her autonomy over her work. This culminated in Ms. Bestmann being fired abruptly in January 2024 without cause.

125.    Additionally, Abhishek Vaidyanathan, a man, had been promoted to General Counsel over Bianca Guimaraes-Chadwick, a woman, even though (i) they were both hired by NEAR at or around the same time and (ii) Guimaraes-Chadwick had approximately double the

amount relevant experience as an attorney compared to Vaidyanathan (nearly 20 years versus less than ten years).

126. In addition, men who behaved poorly, for instance Harshit Tiwari and Konrad Merino, were frequently promoted or otherwise rewarded despite their conduct, while women who acted professionally and performed well were not. To put it simply, female employees' experiences were simply not valued appropriately at the Foundation in comparison with their male peers.

**F.     Ms. Cunningham is Retaliated Against for Speaking Up About her Unpaid Retention Bonus**

127. As discussed above, by the end of 2024, it was clear to Ms. Cunningham that she had no future with NEAR because Polosukhin did not value her and had functionally replaced her with Zalowitz. As a result, she discussed her potential departure with several NEAR executives, including Polosukhin, Monica, and Donovan.

128. In her one-on-one meeting with Polosukhin, Ms. Cunningham stated that, as she had assisted with the leadership transition at NEAR in late-2023 through early-2024, and remained an employee in good standing with the Foundation through January 31, 2024 and far beyond, such that she had fully performed her obligations under the Retention Agreement and was entitled to receive her retention bonus of nine months' salary and token vesting upon her departure.

129. At no point did Polosukhin disagree and even acknowledged that Ms. Cunningham would need to sign a separation  agreement in order to receive her the retention bonus and token vesting.

130. Ms. Cunningham's meeting with the other executives proceeded in largely the same fashion. Ms. Cunningham explained to these executives that, since she had fully performed her obligations under the Retention Agreement, she was entitled to receive the retention bonus of nine months' salary and token vesting upon her departure and they too agreed.

131. Ultimately, Ms. Cunningham and NEAR mutually agreed that March 3, 2025, would be Ms. Cunningham's last day at NEAR.

132. This agreement was memorialized in a series of emails between Mr. Cunningham and Donovan in late-January 2025, in which Donovan wrote "The final date of your employment (3 March 2025) is acknowledged and agreed" and that Ms. Cunningham would still be entitled to receive her 2024 End of Year Bonus.

133. Ms. Cunningham was shocked however, when Donovan, who had previously affirmatively told her she had a right to the Retention Bonus, wrote in this same email that the Foundation was no longer willing to honor the Retention Agreement. Having watched several colleagues receive the Retention Agreement's promised benefits without issue, including, upon information and belief, colleagues who had departed NEAR after January 31, 2024, Ms. Cunningham felt further targeted and disrespected as the sole senior women remaining at NEAR.

134. With the Foundation's leadership stonewalling Ms. Cunningham's efforts to advocate for herself in receiving the compensation promised under the Retention Agreement, Ms. Cunningham felt she needed to retain counsel in order for NEAR and its executives to finally hear her and take her seriously.

135. Once Ms. Cunningham disclosed to NEAR that she had retained counsel to protect her interests, including with respect to any claims she may have for NEAR failing to pay the Retention Bonus and a hostile work environment, NEAR retaliated against her swiftly.

136. In particular, notwithstanding the fact that the parties previously had agreed that Ms. Cunningham would work through March 3, 2025, Ms. Cunningham's attorney was informed that NEAR no longer required Ms. Cunningham's services and that she would be terminated as of February 14, 2025.

22

137.    It quickly became clear that the point of NEAR's arbitrary and retaliatory termination of Ms. Cunningham's employment on February 14, 2025 was to deprive her of the entirety of her End of Year 2024 bonus—an amount equal to $81,000 (the "2024 Bonus")—as when communicating the termination, NEAR stated that Ms. Cunningham was no longer eligible for the 2024 Bonus as a result of having been terminated.

138.    This was despite the fact that the previously agreed upon March 3, 2025, end date was determined precisely so that Ms. Cunningham would receive the 2024 Bonus. Specifically, as part of Ms. Cunningham's discussions with Donovan about her departure from NEAR, Donovan explicitly suggested that her last day be March 3, 2025, so that she could receive the 2024 Bonus because, in Donovan's view, Ms. Cunningham "deserve[d] it."

**G.    NEAR's Illegal Mistreatment of Ms. Cunningham Has Had, and Will Have, an Immense Impact on Her Professionally, Financially, and Personally**

139.    NEAR's illegal, discriminatory, and retaliatory actions toward Ms. Cunningham have taken an immeasurable toll on her emotionally. As a result of the hostile work environment she was subjected to at NEAR, Ms. Cunningham has experienced significant anxiety which has negatively impacted her. The whiplash in Ms. Cunningham's financial situation as a result of NEAR's illegal actions has only exacerbated the extreme anxiety she was already experiencing as a result of NEAR's hostile work environment.

140.    When Ms. Cunningham realized she was being pushed out of NEAR, she secured another job offer which would have provided a steady income with which she could continue to support her family. However, based on the assurance of NEAR executives that she would be paid the Retention Bonus as agreed, Ms. Cunningham instead took the risk of founding her own company. Polosukhin initially offered that NEAR would invest in the company. While Ms. Cunningham was wary of continuing any working relationship with NEAR after all she had

23

endured there, she thought perhaps they could move forward positively once she was no longer employed by the Foundation. However, Ms. Cunningham realized she could not continue to have a professional relationship with NEAR once the Foundation refused to honor her Retention Agreement and terminated her in retaliation for advocating for herself. Ms. Cunningham was now at square one, with no continued salary from her Retention Agreement and no investors.

141. Between Ms. Cunningham's damages for breach of contract, failure to pay wages, retaliation, and the emotional distress caused by the Foundation's discriminatory hostile treatment, she has claims for significant damages against NEAR under New York contract law, the NYLL, the NYSHLR, and the NYCHRL.

**FIRST CAUSE OF ACTION**
(Breach of Contract - Against NEAR)

142. Ms. Cunningham repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

143. On September 28, 2023, Defendant NEAR executed the Retention Agreement, requiring NEAR to pay Ms. Cunningham nine months' salary and token vesting upon Ms. Cunningham's continuation of service at NEAR until at minimum January 31, 2024.

144. The Retention Agreement constitutes a binding, fully enforceable contract entered into between NEAR and Ms. Cunningham.

145. Ms. Cunningham performed all of her obligations under the Retention Agreement.

146. Upon Ms. Cunningham's departure from NEAR, the Foundation refused to pay her Retention Bonus as set forth in the Retention Agreement.

147. As a result of the Foundation's breach of the Retention Agreement, Ms. Cunningham has suffered damage in the amount to be proven at trial but no less than the lump sum of nine months' salary and token vesting, equal to at least $421,000 not including interest.

## SECOND CAUSE OF ACTION
(Breach of the Implied Covenant of Good Faith and Fair Dealing - Against NEAR)

148.     Ms. Cunningham repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

149.     Under New York Law, every contract includes an implied covenant of good faith and fair dealing, which precludes each party from engaging in conduct that will deprive the other party of the benefits of the agreement.

150.     NEAR, by its actions as set forth herein, violated its duty of good faith and fair dealing to Ms. Cunningham when it refused to perform its obligation under the Retention Agreement once it became owed and due.

151.     As a result of NEAR's breaches of duty of good faith and fair dealing, Ms. Cunningham has suffered damages in the amount to be proven at trial but no less than the lump sum of nine months' salary and token vesting, equal to at least $421,000 not including interest.

## THIRD CAUSE OF ACTION
(Promissory Estoppel - Against NEAR)

152.     Ms. Cunningham repeats, alleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

153.     In the alternative, in the event this Court finds that the Retention Agreement is not enforceable, Ms. Cunningham asserts a claim of promissory estoppel.

154.     NEAR and its agents made unequivocal and express verbal promises, representations and guarantees to Ms. Cunningham, in addition to the provision of the Retention Agreement itself, in order to induce her to continue service for NEAR through January 31, 2024, and beyond, including the promise that she would receive nine months' salary and token vesting.

155.     Ms. Cunningham relied upon these representations to her detriment.

156.     Such reliance by Ms. Cunningham was reasonably foreseeable at the time NEAR

and its agents made these promises.

157.  NEAR violated those promises by failing to make the payments required.

158.  As a result of NEAR's actions, Ms. Cunningham has suffered damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
(Discrimination Under the NYSHRL - Against all Defendants)

159.  Ms. Cunningham repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

160.  New York Executive Law § 296(1)(a) provides that:

> "It shall be an unlawful discriminatory practice: For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

161.  As described herein, Defendants discriminated against Ms. Cunningham on the basis of her sex in violation of the NYSHRL by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a discriminatory and hostile work environment in that they treated her less well on the basis of her sex.

162.  As described herein, Defendants discriminated against Ms. Cunningham on the basis of her sex in violation of the NYSHRL by constructively terminating her employment on the basis of her sex.

163.  As a result of the unlawful discriminatory conduct of Defendants in violation of the NYSHRL, Ms. Cunningham has suffered, and continues to suffer, pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of compensatory damages, as well as back pay, front pay, lost benefits, interest,

reasonable attorneys' fees and costs, and other relief.

164.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of the NYSHRL, for which Ms. Cunningham is entitled to the maximum allowable damages under this statute.

**FIFTH CAUSE OF ACTION**
(Retaliation Under NYSHRL - Against all Defendants)

165.    Ms. Cunningham repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

166.    New York Executive Law § 296(7) provides that:

"It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

167.    As described herein, Ms. Cunningham engaged in protected activities, including but not limited to, making internal complaints regarding Polosukhin's mistreatment and the Foundation's discriminatory culture toward women to NEAR's executives, including NEAR's COO and NFC members.

168.    As described herein, after Ms. Cunningham engaged in activities protected by NYSHRL, Defendants took adverse actions against Ms. Cunningham by constructively terminating her, refusing to honor her Retention Agreement, and refusing to pay her earned bonus, that would prevent a reasonable employee from making or supporting a similar complaint of discrimination.

169.    Following Ms. Cunningham's complaints, Ms. Cunningham was subjected to an increasingly hostile environment permeated with discriminatory and retaliatory behavior, as described herein.

170.    As a result of Defendants' retaliatory conduct in violation of NYSHRL, Ms. Cunningham has suffered, and continues to suffer, pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of compensatory damages, as well as back pay, front pay, lost benefits, interest, reasonable attorneys' fees and costs, and other relief.

171.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of the NYSHRL, for which Ms. Cunningham is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**SIXTH CAUSE OF ACTION**
(Discrimination Under the NYCHRL - Against all Defendants)

172.    Ms. Cunningham repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

173.    New York City Administrative Code § 8-107(1) provides that it shall be an unlawful discriminatory practice:

> "For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

174.    As described herein, Defendants discriminated against Ms. Cunningham on the basis of her sex in violation of the NYCHRL by creating, fostering, condoning, accepting,

28

ratifying, and/or negligently failing to prevent or remedy a discriminatory and hostile work environment in that they treated her less well based on her sex.

175.    As described herein, Defendants discriminated against Ms. Cunningham on the basis of her sex in violation of the NYCHRL by constructively terminating her employment on the basis of her sex.

176.    As a result of the unlawful discriminatory conduct of Defendants in violation of the NYCHRL, Ms. Cunningham has suffered, and continues to suffer, pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of compensatory damages, as well as back pay, front pay, lost benefits, interest, reasonable attorneys' fees and costs, and other relief.

177.    The unlawful discriminatory actions of Defendants constitute malicious, willful, and wanton violations of the NYCHRL, for which Ms. Cunningham is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation Under NYCHRL - Against all Defendants)

178.    Ms. Cunningham repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

179.    New York City Administrative Code § 8-107(7):

"It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter, filed a complaint, testified or assisted in any proceeding under this chapter . . . ."

29

180.    As described herein, Ms. Cunningham engaged in activities, including but not limited to, making internal complaints regarding Polosukhin's mistreatment and the Foundation's discriminatory culture toward women to NEAR's executives, including NEAR's COO and NFC members.

181.    As described herein, after Ms. Cunningham engaged in activities protected by NYCHRL, Defendants took adverse actions against Ms. Cunningham by constructively terminating her, refusing to honor her Retention Agreement, and refusing to pay her earned bonus, that would prevent a reasonable employee from making or supporting a similar complaint of discrimination.

182.    Following Ms. Cunningham's complaints, Ms. Cunningham was subjected to an increasingly hostile environment by being treated less well than her male colleagues, as described herein.

183.    As a result of Defendants' retaliatory conduct in violation of NYCHRL, Ms. Cunningham has suffered, and continues to suffer, pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of compensatory damages, as well as back pay, front pay, lost benefits, interest, reasonable attorneys' fees and costs, and other relief.

184.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of NYCHRL, for which Ms. Cunningham is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
(Improper Deduction of Wages Under The NYLL - Against NEAR & WorkCo)

185.    Ms. Cunningham repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

186.    The New York Labor Law § 193 prohibits any deduction from the wages of an employee.

187.    Ms. Cunningham's Retention Bonus under the Retention Agreement is considered "wages" under NYLL § 190(1) because it is expressly linked to Ms. Cunningham's labor services personally rendered, earned and vested on January 31, 2024.

188.    The Foundation willfully failed to provide Ms. Cunningham with her earned Retention Bonus under the Retention Agreement as required under the NYLL.

189.    As a result of Defendants' NYLL violations, Ms. Cunningham is entitled to her still-unpaid Retention Bonus under the Retention Agreement and an equal amount as liquidated damages for the willful violation, plus attorney's fees due hereafter as well as interest, costs, and other relief.

**NINTH CAUSE OF ACTION**
(Retaliation Under NYLL - Against NEAR & WorkCo)

190.    Ms. Cunningham repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

191.    New York Labor Law § 215(1)(a) protects employees from retaliation for making a complaint about an employer's unlawful withholding of wages, including bonuses.

192.    When Ms. Cunningham complained about Defendants' refusal to pay her earned Retention Bonus under the Retention Agreement and retained counsel, Defendants willfully retaliated against Ms. Cunningham by terminating her employment and refusing to pay her 2024 End of Year Bonus.

31

193.    As a result of Defendants' retaliation under the NYLL, Ms. Cunningham is entitled to her still-unpaid Retention Bonus under the Retention Agreement and an equal amount as liquidated damages for the willful violation, plus attorney's fees due hereafter as well as interest, costs, and other relief.

### TENTH CAUSE OF ACTION
(Breach of Contract - Against NEAR)

194.    Ms. Cunningham repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

195.    In late-January 2025, NEAR and Ms. Cunnigham entered into an agreement by which Ms. Cunningham's last day of work was to be March 3, 2025 so that Ms. Cunningham would be entitled to receive her 2024 End of Year Bonus.

196.    This agreement was memorialized in a series of emails between Ms. Cunningham and NEAR.

197.    This agreement constitutes a binding, fully enforceable contract entered into between NEAR and Ms. Cunningham.

198.    Ms. Cunningham performed all of her obligations under this agreement.

199.    Despite the existence of this agreement, NEAR improperly terminated her employment on February 14, 2025 and improperly depriving her of her entitlement to her 2024 End of Year Bonus.

200.    As a result of the NEAR's breach of this Agreement, Ms. Cunningham has suffered damage in the amount to be proven at trial, but at least $81,000 not including interest.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants as follows:

A.    Finding NEAR breached the Retention Agreement;

B.    Awarding damages for breach of the Retention Agreement in an amount to be determined at trial;

C.    Awarding damages for breach of the covenant of good faith and fair dealing in the Retention Agreement in an amount to be determined at trial;

D.    In the alternative, awarding damages for promissory estoppel for Plaintiff's detrimental reliance on the Retention Agreement;

E.    Finding Defendants discriminated and retaliated against Plaintiff in violation of the NYSHRL and the NYCHRL;

F.    Finding Defendants violated the NYLL and retaliated against Plaintiff in violation of the NYLL;

G.    Awarding Plaintiff actual damages and remedies, including back pay, front pay, lost wages, and all other benefits to which Plaintiff is entitled under applicable law, in an amount to be determined at trial;

H.    Awarding Plaintiff compensatory damages to which Plaintiff is entitled under applicable law, including mental and physical pain and suffering, in an amount to be determined at trial;

I.    Awarding Plaintiff punitive damages under applicable law, in an amount to be determined at trial;

J.    Awarding Plaintiff the costs of this action, together with reasonable attorneys' fees as provided under applicable law, in an amount to be determined at trial;

K.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants, breaches of contract, unlawful

employment practices, and violations of the NYLL.

Dated: Brooklyn, New York
      June 5, 2026

                        LACUNA LAW PLLC

                        _____

                        Matthew Weiser
                        159 20th Street, #1B
                        Brooklyn, NY 11232

                        *Counsel for Plaintiff Laura Cunningham*